IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FULL VALUE PARTNERS, L.P., :
    Plaintiff :
  :
v. : Civil No. AMD 04-3399
  :
NEUBERGER BERMAN REAL :
ESTATE INCOME FUND, INC., et al., :
    Defendants :
  :

...o0o...

MEMORANDUM OPINION

This securities class action arises out of a hostile partial tender offer by two trusts to acquire a bare majority of the outstanding shares of a closed-end investment company, defendant Neuberger Berman Real Estate Income Fund, Inc. ("NRL"), and NRL's board's defensive actions taken in response. In *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust*, 342 F.Supp.2d 371 (D.Md. 2004), I adjudicated certain preliminary issues as between the principal disputants in connection with the tender offer. This case is follow-on litigation, in which a shareholder in the company, plaintiff Full Value Partners, L.P. ("plaintiff" or "Full Value"), complains about the actions of the NRL board in responding to the tender offer. Full Value, like defendants here, generally opposed the tender offer. The gist of its complaint is that the directors of NRL (all of whom are named defendants in this case) took improper actions in resisting the tender offer. Now pending is the defendants' motion to dismiss for failure to state a claim filed pursuant to Fed.R.Civ.P. 12(b)(6). The motion has been fully briefed and no hearing is needed. The motion shall be

granted and plaintiff afforded an opportunity to file an amended complaint.

The cardinal facts out of which this dispute arises are largely undisputed and were set forth in my earlier Memorandum Opinion:

> NRL is a closed-end investment company incorporated in Maryland. It invests primarily in real estate securities and is subject to the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 *et seq.* (the "1940 Act"). NRL's common stock is listed and trades on the New York Stock Exchange. Neuberger Berman Management, Inc. (NBM) acts as the investment adviser to NRL. NBM retains Neuberger Berman, LLC ("NBLLC") to serve as the sub-adviser to NRL.
>
> The Trusts are irrevocable grantor trusts domiciled and administered in South Dakota. The Trusts' principal business is investing in securities. Stewart Horejsi is Lola Brown's grandson and Ernest Horejsi's son and an adviser to the Trusts. Horejsi is a private investor and the portfolio manager for two registered investment advisers, Boulder Investment Advisers, LLC ("BIA") and Stewart West Indies Trading Company, Ltd., d/b/a Stewart Investment Advisers ("SIA"). Badlands Trust Company is a trustee of the Trusts. On September 2, 2004, Horejsi and the Trusts jointly filed a Schedule 13D with the Securities and Exchange Commission ("SEC") stating that the Trusts had acquired approximately 10.05% of the outstanding shares of NRL. The Schedule 13D stated that the Trusts: (1) intended to acquire up to just over 50% of the outstanding shares of NRL; (2) would consider changing or expanding the investment objective of the Fund; (3) intended to replace NRL's directors; (4) intended to replace the Fund's investment adviser with BIA and SIA; and (5) intended to replace the Fund administrator with an affiliate of the Trusts.
>
> On September 10, 2004, the Trusts commenced a partial tender offer to purchase for cash up to 1,825,000 outstanding shares of common stock of NRL, so as to acquire up to 50.01% of NRL's outstanding shares. The Schedule TO filed with the SEC indicated that the Trusts had acquired an additional 8,000 shares of NRL common stock beyond that disclosed on September 2, 2004, such that the Trusts collectively owned approximately 10.22% of the outstanding shares. The offer and corresponding withdrawal rights were announced to expire at midnight on October 8, 2004. On October 4, 2004, the Trusts extended the expiration date to midnight on October 15, 2004.
>
> Following the Trusts' tender offer, NRL's Board formed a Special

Committee of independent directors to evaluate the terms of the offer. On September 23, 2004, the Special Committee concluded that the tender offer was not in the best interests of the stockholders and so informed the Board. The Board recommended to NRL's shareholders that they reject the tender offer and not tender their shares.

The Board then took several actions. First, the Board signed a "Common Stock Purchase Agreement," pursuant to which the Board issued 139,535 unregistered shares of NRL common stock to NBLLC for $21.50 per share, a price equal to NRL's net asset value and higher than the market price. As a result of this "Private Placement," the Trusts' ownership interest was reduced to 9.92% of NRL's voting shares. The Board then adopted a resolution, effective immediately after the issuance of the shares to NBLLC, electing the Fund to be subject to both the Maryland Control Share Acquisition Act ("MCSAA"), Md.Code Ann., Corps. & Ass'ns §§ 3-701 *et seq.* (2003), and the Maryland Business Combination Act, Md.Code Ann., Corps. & Ass'ns §§ 3-601 *et seq.* (2003). Under the MCSAA, any shareholder who owns "control shares" (greater than 10% of the company) may not vote those shares above 10% without two-thirds approval from the other, disinterested shareholders at a Special Meeting. § 3-702(a)(1).

The Board also adopted a "Rights Agreement" or so-called "poison pill." Under the Rights Agreement, the Board declared a dividend of one "right" for each outstanding share of common stock. Each right entitles the holder to purchase from the Fund, on the "Distribution Date," three shares of common stock at a price equal to the par value ($.0001) of such shares. The Distribution Date is the tenth day following a public announcement that a person or group of affiliated persons (the "Acquiring Person") have acquired beneficial ownership of 11% or more of the outstanding shares of common stock. Prior to the Distribution Date, the rights are nontransferable, *i.e.,* they are transferred with and only with the shares of common stock. Rights held by an Acquiring Person in excess of the rights associated with 11% of the common stock outstanding after the Distribution Date become void. The Board also authorized the Fund to commence a self tender offer for 943,704 shares of common stock at a price of $20.00 per share, a price below the net asset value per share but higher than the price offered in the Trusts' tender offer. The Board recommended that shareholders *not* tender into the self tender offer and declared in a filing with the SEC that "stockholders who *do not* tender will receive the benefit of the increase in net asset value per share after giving effect to the self tender offer." (Emphasis added.) According to NRL, the self tender offer was "designed to provide liquidity to the Fund's stockholders, if required, without requiring them to tender" to the Trusts. The

Trusts offered to purchase shares for $19.89 per share.

*Id*. at 372-74 (footnotes omitted). After an expedited, non-evidentiary hearing, I concluded that the NRL directors did not violate the Investment Company Act of 1940 in adopting the poison pill. *Id*. at 374-76.

As mentioned above, Full Value did not favor the tender offer and readily noted in its complaint that few shareholders would tender their shares because the Trusts offered no premium over the current trading price. The gravamen of plaintiff's claim is that "the [NRL] Board did not simply [recommend that stockholders decline the tender offer] . . . [but instead took] three actions [described *supra*] to preclude the Tender Offer, any improvement to the Tender Offer, or any competing offers." *See* Complaint at ¶27. Instead, according to plaintiff, the NRL board *should have taken* what it describes as "the only appropriate responses," *id*. at ¶39, namely, "to provide a superior alternative or to adopt measures to allow shareholders to liquidate their holdings at [net asset value]." *Id*. Thus, plaintiff seeks injunctive and declaratory relief on behalf of all shareholders (except those in privity with or identified with the members of NRL board and certain others) whereby the court would order the board, *inter alia*, to make it possible for "shareholders to liquidate their holdings at [net asset value]."

Plaintiff sues in seven counts: four federal claims and, apparently, four state law claims.[1] For the reasons stated in my earlier memorandum opinion, cited and quoted above,

---

[1] It appears that count VI is intended to assert discrete federal and state law claims. On the other hand, it appears that count VII is simply redundant of one or more other counts.

I have concluded that *the poison pill does not violate federal law*. Inasmuch as the tender offer cannot proceed so long as the poison pill is in place, therefore, under the present circumstances, plaintiff's assertion that one or more of the other defensive actions taken by the directors of NRL violate federal law is of no moment.[2] That is, in the present circumstances of the two closely interrelated cases, any consideration of the remaining federal claims in this case could produce merely an advisory opinion, which of course is strictly prohibited. *E.g., North Carolina v. Rice,* 404 U.S. 244, 246 (1971). Accordingly, insofar as plaintiff seeks declaratory and injunctive relief on the basis of federal law to compel the NRL board to facilitate a net-asset-value cash-out by its shareholders, its claims are not cognizable.

As for the state law claims, I am strongly inclined to the view advanced by NRL that the allegations of the complaint are too conclusory to state a claim of breach of fiduciary duty on the part of members of the NRL board. Despite the customary "notice pleading" standard applicable in actions filed in federal court, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002), I am inclined to agree with NRL that even for pleading purposes, substantive Maryland law places a "thumb on the scale" in both derivative and direct actions

---

[2]In *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust*, 225 F.R.D. 171 (D.Md. 2004), persuaded by the Trusts' contention that the tender offer would not proceed in the face of the poison pill and that appellate review of that issue could be wholly dispositive of the case, I certified my earlier declaratory judgment for interlocutory appeal pursuant to Fed.R.Civ.P. 54(b). Upon NRL's motion to dismiss the appeal, however, the Fourth Circuit found that I had erred in entering the certification order and dismissed the appeal. Accordingly, the case is proceeding to a resolution of all issues necessary to a final appealable judgment.

instituted against corporate directors in the form of a presumption in favor of the conclusion that corporate directors have exercised a good faith "business judgment" in circumstances identical to or closely analogous to those presented here. *See Wittman v. Crooke,* 120 Md.App. 369, 376 (1998). Thus, state law principles intended to insulate corporate directors from nettlesome "second-guessing," in the form of mere conclusory allegations, in legal actions seeking to challenge their presumed good faith must be acknowledged even in federal court when considering the sufficiency of a pleading asserting a cause of action based in significant part on an alleged breach of fiduciary duty, which is, undeniably, the gravamen of the state law claims here. *Cf. Hudson v. Prime Retail, Inc.*, No. 24-C-03-5806, 2004 WL 1982383, at 12 (Md. Cir. Ct. April 1, 2004)(citing favorably *In re General Motors Class H Shareholders Litg.*, 734 A.2d 611, 617 (Del Ch. 1999), and *Orman v. Cullman*, 794 A.2d 5, 23 n 44 (Del Ch. 2002)); *and see* Md. Code Corps. & Ass'ns § 2-405.1.

Nevertheless, I shall not finally resolve the issue whether plaintiff has offered allegations sufficient to call into question the application of the Maryland "business judgment" doctrine at this time. Plaintiff has not sought to establish subject matter jurisdiction in this case on the basis of diversity of citizenship and therefore, understandably, has failed to allege the citizenship of any of the individual defendants in this case. Rather, plaintiff has (permissibly) invoked the supplemental jurisdiction statute. 28 U.S.C. § 1367. As all the federal claims here are either resolved as a matter of law in favor of defendants (in view of my earlier memorandum opinion) or deemed non-justiciable, it is incumbent upon

plaintiff to establish an independent basis for federal jurisdiction over the state law claims. *See* 28 U.S.C. § 1367(c)(2), (3).

Accordingly, for the reasons set forth, the motion to dismiss shall be granted without prejudice to plaintiff's right to file an amended complaint on or before May 6, 2005.


Filed: April 18, 2005                                    /s/
                                                     ANDRE M. DAVIS
                                                     UNITED STATES DISTRICT JUDGE